**TECH–WEAR, INC. and Anti–Static Cleanroom Technologies, Inc. dba TW Clean, Plaintiffs,**

v.

**ACME LAUNDRY PRODUCTS, INC. dba Hi–Tec Garments and Does 1 Through 10, Inclusive, Defendants.**

**No. CV 98–2717 CM (CWx).**

United States District Court,
C.D. California.

June 9, 1998.

Kent B. Goss, Valerie M. Goo, Pillsbury Madison & Sutro, Los Angeles, CA, for plaintiffs.

Gary A. Clark, Keith A. Newburry, Tawnya R. Wojcuechowski, Sheppard Mullin Richter & Hampton, Los Angeles, CA, for defendants.

ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND GRANTING REQUEST FOR ACCELERATED PRETRIAL DISCOVERY

MORENO, District Judge.

## I

### INTRODUCTION AND RELEVANT BACKGROUND

Plaintiffs Tech Wear, Inc. and Anti–Static Cleanroom Technologies, Inc. dba TW Clean filed this action together with their motion for preliminary injunction and accelerated pretrial discovery against defendants Acme Laundry Products, Inc. dba Hi–Tec Garments and Does 1 through 10, inclusive, on April 13, 1998. The case arises out of plaintiffs' contention that defendant's "Hi–Tec Garment" infringes plaintiffs' patent for a multi-path static control garment, U.S.Patent No. 5,440,444 ("the '444 patent"). Both garments are designed and worn to prevent static electricity discharge and to control cleanroom contamination in the manufacture and assembly of electrical components. Plaintiffs also allege that defendant has engaged in unfair competition and false advertising.

Acme contends that its garment does not use either a conductive or insulative fabric but rather an "industry standard 'static dissipative' material" that avoids four of the seven elements of claim 4 of the '444 patent. Defendant argues that proper claim interpretation shows that plaintiffs' patent does not cover every approach to "dual path to ground" electrostatic discharge ("ESD") garments, and, as a result, Acme's garment does not infringe the '444 patent. Moreover, Acme worked closely with customers IBM and Western Digital to meet their specifications and did not misrepresent the product.

## II

### FACTUAL BACKGROUND

Plaintiffs allege as follows:

Since 1987, plaintiff Tech Wear, Inc. has been in the business of producing garments and other accessories that dissipate static electricity. Because these garments, called "ESD garments," help to control the static electricity normally generated by a person's body and clothing, they are very useful in the manufacture and assembly of electrical components. Otherwise, a worker's movements create static electricity that can easily and permanently damage the electrical components, leading to high failure rates. ESD garments greatly reduce these failure rates.[1]

ESD garments control static electricity in one of two ways: (1) the fabrics themselves resist production of static electricity, or (2) the garments contain a grounding connection that channels the static electricity from the person to the ground (called "path to ground").

Tech Wear is a leader in the field and supplies its products to Intel, Motorola, Hewlett Packard, Lucent Technologies, and Qualcomm. In 1994, Tech Wear's president, Kay Adams, developed a new ESD garment technology to better control static electricity. The new garment provides paths to ground from both the person and the garment and provides two independent paths to ground. The two independent paths to ground prevent electricity flow between the paths, thus making the design compatible with the use of a "dual resistive-loop monitor." This device monitors each independent path to ground for effectiveness, ensuring that the person and garment remain grounded. The system reduces failure rates even more.

This new technology, providing two independent paths to ground and grounding both the person and the garment, is known in the industry as "dual path to ground."

In 1994, Ms. Adams filed for a U.S. patent on her invention. The U.S.Patent Office issued Patent Number 5,440,444 (the " '444 patent") for a "Multi–Path Static Control Garment" in her name on August 8, 1995. She subsequently assigned the '444 patent to Tech Wear. Tech Wear has been manufacturing and selling ESD garments using the '444 Patent technology for the last two years.

Existing Tech Wear customers began expressing a need for a garment that functioned both as an ESD garment and as a "cleanroom" garment.[2] In 1997, Ms. Adams and two of her colleagues formed a new corporation, Anti–Static Cleanroom Technologies, Inc. d/b/a TW Clean to meet the need. Plaintiff TW Clean currently manufactures ESD cleanroom garments using the "dual path to ground" '444 patent technology. TW Clean has an exclusive license to the rights under the '444 patent for the cleanroom industry.

Plaintiffs allege that within the last year, Acme has begun manufacturing, selling and offering for sale an ESD cleanroom garment using the system of independent paths to ground claimed in claim 4 of the '444 patent in direct competition with TW Clean. Plaintiffs contend that Acme represents to potential customers, manufacturers, and users of its ESD garment that the garment is a "dual path to ground" device offering two independent paths to ground and grounding the garment and the person. Plaintiffs further contend that Acme's garment does not ground the garment itself.

Defendant responds as follows:

Defendant Acme Laundry Products, Inc. is a family-owned business engaged in manufacturing and selling industrial gar-

---

1. "The generation of static electricity can often cause sensitive electronic equipment to 'fuse' or otherwise 'short out' rendering the electronic component useless. In the electronics industry, such a mishap is measured in 'fail rates.' " Declaration of Kay Adams in Support of Plaintiffs Tech Wear, Inc.'s and Anti–Static Cleanroom Technologies, Inc. d/b/a TW Clean's Motion for Preliminary Injunction and Accelerated Pretrial Discovery ("Adams Dec."), ¶ 4.

2. Cleanroom garments are designed to prevent physical particles from a person's body or clothing from contaminating an otherwise clean room used in the manufacture of sensitive electrical equipment such as disk drives and semiconductors.

ments for over twenty years. Acme's Hi–Tec Garments division custom manufactures garments for the cleanroom industry, including ESD garments. Hi–Tec developed the H1263 coverall (the garment at issue) "in close cooperation with" IBM and Western Digital Corporation and began supplying them in early to mid–1997. Acme contends that it does not advertise the H1263 garment and sells it just to three commercial laundries that in turn supply the garment and laundry services to IBM and Western Digital.

Acme states that IBM and Western Digital specify the design and the materials used to make the H1263 and that neither company has complained about the garment's performance. Acme uses a static-dissipative fabric called "Integrity 2000" manufactured by Precision Fabrics Group, Inc. ("PFG"). Both PFG and Acme's customers have determined that the material has a surface resistivity of about $10^8$ ohms which held up through 300 launderings. The material never lost its ESD properties or became "insulative," contrary to plaintiffs' contention.

The H1263 garment has two "conductive ribbon systems, one on each side of the garment." Defendant Acme's Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion for Preliminary Injunction and Accelerated Pretrial Discovery ("Def.Opp.Mem."), p. 3. Defendants explain:

> Although the two ribbon systems do not physically connect together on the garment, they are sewn into the seams of the garment in intimate contact with the static dissipative fabric, without any insulation between the ribbons and the fabric.... Each ribbon system includes two grounding terminals. The cuff on each sleeve of the Acme garment is connected to one of the sets of ribbons to ensure that both the wearer and the garment have an electrical path to a ground.... Further, since the ribbons are in intimate contact with the garment material and extend to every panel of the garment, they serve to ground the garment itself, in that any static charges

on the Acme garment will be dissipated by the material to either or both of the ribbons and then conducted by the ribbons to ground.... As a result, it cannot be said that the two ground paths in the Acme garment are electrically isolated from one another.

*Id.*, pp. 3–4 (citations omitted).

*The '444 Patent:*

U.S.Patent Number 5,440,444, entitled "Multi–Path Static Control Garment," and dated August 8, 1995, is described in the abstract as "[a] dual path static control garment ... formed of a garment material having a continuous grid of conductive fibers throughout the body section and sleeves." Exhibit A to Adams Dec., p. 11. The abstract continues:

> One elastic wrist hugging cuff is formed of an electrically conductive material and thereby connects one wrist of the wearer, through the garment itself, to a first grounding terminal secured to a body section of the garment. A second and independent grounding path is provided from the second cuff to a second grounding material on the body section. The second path is provided by a cuff assembly having an inner conductive wrist hugging cuff and an outer nonconductive cuff connected to the garment sleeve. A conductive ribbon encased in an insulating sheath electrically interconnects the inner conductive cuff to the second grounding terminal and is insulated from the garment and its sleeves to provide the second independent grounding path.

*Id.* Claim 4 of the '444 patent consists of the following seven elements:

> A multi-path static control garment comprising:
> [1] a body section;
> [2] first and second sleeve sections connected to said body section,
> [3] first electrically conductive body contact means on said first sleeve section,
> [4] second electrically conductive body contacts means on said second sleeve section,

[5] first and second mutually insulated electrical grounding means mounted on said body section, .

[6] first electrically conductive connecting means electrically interconnecting said first electrically conductive body contact means with said first grounding means, and

[7] second electrically conductive connecting means interconnecting said second electrically conductive body contact means with said second grounding means, said second electrically conductive connecting means being electrically insulated from said first electrically conductive connecting means, whereby two mutually independent and mutually isolated grounding paths are provided from said first and second sleeve sections, respectively.

*Id.,* p. 17.

As defendant notes, the '444 patent expressly incorporates another patent, U.S.Patent No. 4,639,825, by reference. The '825 patent defines several key terms, not defined in the '444 patent:

The term "conductive" herein, and according to its customary usage in the art, means an electrical resistance of between zero and $10^5$ ohms. Similarly, "dissipative" means a resistance of between $10^5$ and $10^9$ ohms, "antistatic" means a resistance of between $10^9$ and $10^{14}$ ohms, and "insulative" means a resistance of more than $10^{14}$ Ohms.

Exhibit B to Declaration of Brad Jubin in Support of Plaintiffs Tech Wear, Inc.'s and Anti–Static Cleanroom Technologies, Inc. d/b/a TW Clean's Motion for Preliminary Injunction and Accelerated Pretrial Discovery ("Jubin Dec."), p. 17.

## III

## DISCUSSION

### A

#### Standard

Under section 283 of Title 35 of the United States Code, the court may grant a preliminary injunction "to prevent the violation of any right secured by patent." The law of the Federal Circuit controls because injunctions generally involve matters unique to patent law. *Foster v. Hallco Manufacturing Co., Inc.,* 947 F.2d 469, 475 (Fed.Cir.1991).

To obtain a preliminary injunction here, plaintiffs "must establish a right thereto in light of four factors: (1) reasonable likelihood of success on the merits; (2) irreparable harm; (3) the balance of hardships tipping in its favor; and (4) the impact of the injunction on the public interest." *Hybritech Incorporated v. Abbott Laboratories,* 849 F.2d 1446, 1451 (Fed. Cir.1988). Although no one of the four factors, is dispositive, two are particularly important. Indeed, "failure to establish . . . likelihood of success on the merits and irreparable harm . . . will absolutely preclude injunctive relief." E. Filardi and S. Weingaertner, "Injunctive Relief in Patent Infringement Cases," 492 *PLI/Pat* 227, 236 (September 25, 1997), *citing Reebok International Ltd. v. J. Baker, Inc.,* 32 F.3d 1552, 1555 (Fed.Cir.1994); *Hybritech,* 849 F.2d at 1451; *Intel Corp. v. ULSI System Technology, Inc.,* 995 F.2d 1566, 1568 (Fed.Cir.1993), *cert. denied,* 510 U.S. 1092, 114 S.Ct. 923, 127 L.Ed.2d 216 (1994).

Irreparable harm will be presumed "when a clear showing has been made of patent validity and infringement." *H.H. Robertson Co. v. United Steel Deck Inc.,* 820 F.2d 384, 390 (Fed.Cir.1987). Without that clear showing, a patentee must submit evidence and reasoned analysis to support the argument that money damages will not be an adequate remedy. *Nutrition 21 v. United States,* 930 F.2d 867, 872 (Fed.Cir. 1991). "The movant bears the burden of proving entitlement to relief." *Sofamor Danek Group, Inc. v. DePuy–Motech, Inc.,* 74 F.3d 1216, 1219 (Fed.Cir.1996), *citing Reebok, supra,* 32 F.3d at 1555.

Even when a patentee is entitled to the presumption of irreparable harm based on his clear showing of infringement, the pre-

sumption may be rebutted with clear evidence that no harm will result if the injunction is denied. *Roper Corp. v. Litton Systems, Inc.,* 757 F.2d 1266, 1272 (Fed. Cir.1985).

## B

### *Analysis*

#### 1. *Irreparable Injury*

■ Plaintiffs support their argument that they will suffer irreparable injury if an injunction does not issue with statements in two declarations. Tech Wear president Kay Adams states that she knows of just two ESD systems that are compatible with use of a dual resistive-loop monitor. She also declares: "Defendant's wrongful conduct is diminishing TW Clean's market share and sales of ESD cleanroom garments and is harming Tech Wear's reputation as an innovator and leader in the ESD garment and accessories industry." Adams adds that the market for ESD cleanroom garments is restrictive and that the items are "quite costly to make." She concludes that "defendant's patent infringement, false advertising and unfair competition is causing Tech Wear to lose good will and confuses 'the public and people in the ESD industry as to what the term "a garment with Dual Path to Ground" refers.'" Adams Dec., ¶ 36. Adams provides no sales figures, specific instances, or other evidentiary facts to support the conclusion that TW Clean is losing market share. Qualifications such as "relatively limited," "almost exclusively," "quite costly," and "for all practical purposes" render plaintiffs' claims even less specific.

The only other evidence plaintiffs cite to show that they have been or will be irreparably injured is paragraph 8 of TW Clean treasurer Michelle McSwain's declaration. McSwain states that the market for ESD cleanroom garments is restricted and customers are limited. She similarly provides no evidentiary facts. In sum, the record before the Court fails to support plaintiffs' claims of irreparable injury or contention that damages alone would not adequately compensate them. Unless plaintiffs show with clear evidence that they are likely to prevail on the merits, a preliminary injunction cannot issue.

#### 2. *Reasonable Likelihood of Success on the Merits*

"A patent is a government grant of rights to the patentee." *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 978 (Fed.Cir.1995) (in banc), *citing* 35 U.S.C. § 154. The grant entitles the patent owner "to exclude others from making, using, or selling the invention as claimed" for a limited time. *Id.* The potential consequences of infringing the patentee's rights can include being enjoined and required to pay increased damages, attorney's fees, and costs. *Id., citing* 35 U.S.C. §§ 283–285.

The statute requires "a written description of the invention that will enable one of ordinary skill in the art to make and use it." *Id., citing* 35 U.S.C. § 112, ¶ 1. Moreover, "[t]he specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112, ¶ 2. The Federal Circuit explained that "it is only fair . . . that competitors be able to ascertain to a reasonable degree the scope of the patentee's right to exclude." *Markman,* 52 F.3d at 978.

To determine whether plaintiffs have clearly shown that they are reasonably likely to succeed on the merits of their patent infringement claim, the court first construes the claim and then compares the accused device "to determine whether all of the claim limitations are present either literally or by substantial equivalent." *Vehicular Technologies Corp. v. Titan Wheel International Inc.,* 141 F.3d 1084, 46 U.S.P.Q.2d 1257, 1260, 1998 WL 156722 (1998); *see also Southwall Technologies, Inc. v. Cardinal IG Company,* 54 F.3d 1570, 1575 (Fed.Cir.1995). The court considers "[t]he claims, the specification, and the prosecution history to determine the

meaning of claims[.]" *Markman,* 52 F.3d at 979.[3] The Federal Circuit has explained that "[c]laims must be read in view of the specification of which they are a part ... the [written] description may act as a sort of dictionary, which explains the invention and may define the terms used in the claims." *Id.* (citations omitted). "Claim construction begins, as it must, with the words of the claims." *Vehicular Technologies, supra,* 141 F.3d 1084, 46 U.S.P.Q.2d at 1260 (citation omitted).

Consistent with the underlying policy that a patent ought to give fair notice of what the inventor claims is included and excluded, courts generally resist relying on outside interpretations or experts. Indeed, "[e]xtrinsic evidence may not be used to vary or contradict the claim language." *Raleigh v. Tandy Corporation,* 1997 WL 26299 (N.D.Cal.1997), p. *1, *citing Markman,* 52 F.3d at 981. Expert testimony, moreover, may be used "only as a last resort." *Id., citing Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1585 (Fed.Cir.1996) (extrinsic evidence to aid court in understanding the underlying technology may be acceptable, whereas expert testimony on proper construction of disputed claim should rarely be needed).

Under paragraph 6 of Section 112, "[a]n element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." 35 U.S.C. § 112, ¶ 6. This "means-plus-function" limitation, as it is called, "recites a function to be performed rather than definite structure or materials for performing that function." *Chiuminatta Concrete Concepts, Inc. v. Cardinal Industries, Inc.,* 145 F.3d 1303 (Fed.Cir.1998). The court added: "Likewise, the 'means' term in a means-plus-function limitation is essentially a generic reference for the corresponding structure disclosed in the spec-

ification." *Id.* "To determine whether a claim limitation is met literally, where expressed as a means for performing a stated function, the court must compare the accused structure with the disclosed structure, and must find equivalent structure as well as identity of claimed function for that structure." *Id., quoting Pennwalt Corp. v. Durand–Wayland, Inc.,* 833 F.2d 931, 934 (Fed.Cir.1987) (in banc), *cert. denied,* 485 U.S. 961, 108 S.Ct. 1226, 99 L.Ed.2d 426 (1988).

### a. Literal Infringement

As noted above, the results of a two-step analysis determine whether the accused device literally infringes a patent. The court first interprets the relevant claims to determine their meaning and scope. *Southwall, supra,* 54 F.3d at 1575, *citing Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 979 (Fed.Cir.1995) (in banc); *Senmed, Inc. v. Richard–Allan Medical Industries, Inc.,* 888 F.2d 815, 818 (Fed. Cir.1989). The trier of fact then "determines whether the claims as thus construed read on the accused product." *Id., citing Senmed,* 888 F.2d at 818. Literal infringement requires that the accused product contain every limitation set forth in the patent, "exactly." *Id., citing Becton Dickinson & Co. v. C.R. Bard, Inc.,* 922 F.2d 792, 796 (Fed.Cir.1990).

Here, plaintiffs argue that Acme's garment literally infringes the Adams patent because the third and fourth elements of claim 4 "call for an electrically conductive body contact on each sleeve of the garment," which the Acme garment meets through electrically conductive carbon fibers sewn into each sleeve that contact the wearer's body. Memorandum of Points and Authorities in Support of Plaintiffs Tech Wear, Inc.'s and Anti–Static Cleanroom Technologies, Inc. d/b/a TW Clean's Motion for Preliminary Injunction and Accelerated and Pre–Trial Discovery ("Pl. Mem."), p. 6. Plaintiffs also contend that the Acme garment literally infringes their

---

3. No patent prosecution history was submitted.

patent because the sixth element of Claim 4 requires the electrically conductive body contact on one of the sleeves to be electrically connected to a grounding means and that the metal snaps on Acme's garment serve this purpose. In addition, the electrically conductive ribbons connect the electrically conductive body contact in one of the sleeves to one of the grounding snaps, thus literally infringing plaintiffs' patent.

Defendant responds that its garment cannot be both insulative, providing the required grounding paths, *and* grounded simultaneously, as Claim 4 requires. Def. Opp.Mem., p. 13. Defendant also contends that the Integrity 2000 fabric it uses, at $10^8$ ohms, "is indisputably much closer to the 'conductive' threshold ($10^5$ ohms) than it is to the 'insulative' threshold ($10^{14}$ ohms), according to the definitions incorporated in the Adams '444 patent." *Id.,* p. 14. "As a result, Acme's garment cannot insulate the conductive ribbons to prevent static electricity from flowing between them." *Id.* Defendant argues that its garment is different in important ways from plaintiffs' product, most notably, with regard to the last four of the seven claims.

Plaintiffs deny that elements 3 through 5 of Claim 4 are "means-plus-function" limitations, but argue that they require only "the presence of mutually insulated electrical grounding terminals mounted on the body section[.]" Memorandum of Points and Authorities in Reply to Defendant's Opposition to Plaintiffs' Motion for Preliminary Injunction and Accelerated Pretrial Discovery ("Pl. Reply Mem."), pp. 2–3. Plaintiffs do concede that elements 6 and 7 are "means-plus-function" limitations. They argue, though, that the relevant "function" for each element is merely to "electrically interconnect the first/second electrically conductive body contact with the first/second grounding terminal." *Id.,* p. 3. The requirement of the second electrically conductive connecting means being electrically insulated from said first electrically conductive connecting means (Element 7) is a "condition" of the claim, not a "function," they contend. The important

point is that each body contact is grounded. Plaintiffs add that the structure of conductive fibers either woven into the fabric of the body section (their garment) or woven into a ribbon (defendant's structure) is an insubstantial change given the fact that both approaches achieve the same result.

As for the mutual insulation between the grounding paths recited in Element 7 of Claim 4, plaintiffs argue that this, too, is merely a "condition," not a "means-plus-function" limitation. Besides, defendant did not test the resistivity of the garment but rather asserted that it was a feature of the fabric. Plaintiffs state that no evidence has been submitted on whether the resistivity of the Integrity 2000 material changed at all once it was made into the H1263. Ms. Adams' own test of one of Acme's garments remains undisputed here.

Defendant does not dispute the literal infringement of elements 1 and 2 of Claim 4, as they deal with generic components of the garment (body and sleeves). Defendant is correct that the word "means" appears in the remaining elements, but in contrast to, for example, the patent-in-suit in *Chiuminatta Concrete,* which specified the structure and the function, elements 3, 4, and 5 of the '444 patent do not describe a particular function. Rather, Claims 3 and 4 each require an electrically conductive body contact means on the sleeve sections, and Claim 5 requires mutually insulated electrical grounding means mounted on the body section. In plaintiffs' drawing of the Acme garment, to which defendant did not object, the first five elements are present. Notably, the Acme garment contains the body and sleeve sections, the carbon fibers knit into each of the sleeve cuffs are electrically conductive, and the snaps in the body section provide an electrical grounding means. Adams Dec. ¶¶ 22–25 and Ex. D.

Plaintiffs agree that elements 6 and 7 are " means-plus-function" elements. The function for each element is to electrically

interconnect the electrically conductive body contact with the appropriate grounding terminals. The seventh element further requires that the two paths remain insulated from each other. As plaintiffs explain, conductive fibers are key to each garment. Each one uses conductive fibers as a way to interconnect the body contacts and the grounding terminals, although the insulation called for in element 7 is not identical.

■■■ The problem with finding literal infringement, however, is that it is difficult to say at this stage that Acme's version of element 7 is "equivalent" within the meaning of Section 112, paragraph 6. As the Supreme Court explained, the analysis of equivalence under Section 112 applies "the doctrine of equivalents in a restrictive role, narrowing the application of broad literal claim elements." *Warner–Jenkinson*, 117 S.Ct. at 1048. Thus, equivalence analysis under Section 112 "requires identical, not equivalent function." *Chiuminatta Concrete*, 145 F.3d 1303, 1310. The Court cannot determine on the present record that the Acme garment's static dissipative fabric and dual conducting ribbons are identical to element 7 of Claim 4 of the '444 patent. As the Federal Circuit explained the difference between equivalence analysis under Section 112, paragraph 6 and under the doctrine of equivalence, the latter allows for technological advances not readily foreseen when the patentee applied for the patent. There is at least a reasonable question here as to whether Acme's garment's structure was in the nature of a "technological advance," that is, a variant that could not have been disclosed in the patent. Thus, although it is not possible to conclude that Acme's garment is equivalent within the meaning of Section 112, paragraph 6, "this analysis should not foreclose it from being an equivalent under the doctrine of equivalents." *Chiuminatta Concrete*, at 1310. (where technology predated invention at issue, no basis for finding equivalence under doctrine of equivalents).

### b. *Infringement Under the Doctrine of Equivalents*

■■■ As the Federal Circuit has explained recently, "[a] device that does not literally infringe a claim may nonetheless infringe under the doctrine of equivalents if every element in the claim is literally or equivalently present in the accused device." *Sage Products, Inc. v. Devon Industries, Inc.*, 126 F.3d 1420, 1423 (Fed. Cir.1997), *citing Pennwalt*, 833 F.2d at 934–35. To be "equivalently present" in the accused device, only insubstantial differences must "distinguish the missing claim element from the corresponding aspects of the accused device." *Id., citing Hilton Davis Chemical Co. v. Warner–Jenkinson Co.*, 62 F.3d 1512, 1517–18 (Fed.Cir.1995) (in banc), *rev'd on other grounds*, 520 U.S. 17, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997). The rationale for the doctrine is to "prevent[ ] an accused infringer from avoiding infringement by changing only minor or insubstantial details of a claimed invention while retaining their essential functionality." *Sage Products*, 126 F.3d at 1424 (citations omitted).

The Federal Circuit has noted that when a patentee has elected to claim an invention more narrowly than necessary and receives a correspondingly narrow patent, the doctrine of equivalents may not help him in an infringement action. The court has attempted to prevent patentees from filing and prosecuting narrow claims only to expand them during litigation through the doctrine of equivalents. Such a strategy fails to notify the public properly of the scope of the invention and would enable the "real" patent to escape full examination by the Patent Office examiners. *Id.* at 1425 ("as between the patentee who had a clear opportunity to negotiate broader claims but did not do so, and the public at large, it is the patentee who must bear the cost of its failure to seek protection for this foreseeable alteration of its claimed structure.").

The second test under the doctrine of equivalents has been dubbed the "function-

way-result" test. Thus, "[a]n accused product that does not literally infringe a claim may infringe under the doctrine of equivalents if 'it performs substantially the same function in substantially the same way to obtain the same result.'" *Southwall*, 54 F.3d at 1579, *quoting Graver Tank & Manufacturing Co. v. Linde Air Products Co.*, 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950). The Federal Circuit added that the accused product must contain "specific structure which meets all limitations of an asserted claim directed to structure, at least equivalently, [for] that product [to] infringe under the doctrine of equivalents." *Id., citing Pennwalt*, 833 F.2d at 935.

In this case, plaintiffs argue that Acme's H1263 also infringes their patent under the doctrine of equivalents. With respect to the two components of the seventh element of Claim 4, plaintiffs contend that Acme meets the first component literally. Specifically, the electrically conductive body contact on the second sleeve electrically connects to a second grounding means.

Concerning the second component of element 7, plaintiffs argue that the requirement that the two grounding paths be insulated from each other is met by the fact that Acme's garment is made of material that has such high resistivity that the paths are effectively insulated. The resistance between the two paths in the Acme garment is much farther away from the "conductive threshold," but much closer to the "insulative" threshold.

Defendant disputes plaintiffs' arguments in several respects. First, for example, defendant's garment has a "regular conductive cuff that is not insulated at all from the sleeve," like plaintiffs.' Def.Opp. Mem., p. 18. Even on element 5, defendant adds, Acme's grounding terminals "are both mounted directly on the body section and one of the two ribbon systems, without any attempt to insulate the terminals from one another." *Id.*, p. 19.

Element 6 is not found in Acme's garment either. Acme's "material is only static dissipative, not conductive." On element 7, Acme's garment's second electrically conductive ribbon is not wrapped in an insulating sheath and is not electrically insulated from the garment material or from the other electrically conductive ribbon. Acme argues that plaintiffs simply failed to realize that neither electrical isolation between conductive paths nor conductive garment material were needed to make an ESD cleanroom garment.

Plaintiff replies that the only differentiating feature of the two garments, namely, the degree of insulation between the grounding pathways, is insubstantial. Under the "insubstantial difference" test of the doctrine of equivalents, defendant has infringed the '444 patent.

Even under the "function-way-result" test, plaintiffs contend that defendant has infringed the '444 patent. The use of a conductive ribbon rather than a "dispersed" conductive thread path uses the same "way" (conductive fiber) to achieve the same result (conductive path). The insulating sheath for the first grounding path, plaintiffs note, is rendered unnecessary precisely because defendant concentrated the conductive fibers into one ribbon rather than using material with such fibers woven throughout the fabric.

Plaintiffs' argument on this point is supported at least in part by defendant's declarant, Gary W. Knoth, the Senior Principal Contamination Control Engineer at Western Digital. He explains the importance of dissipating static electric charges as they occur and describes how the Acme garment achieves this result:

> In addition to the dual grounding paths, the fabric of the Acme garment must dissipate static charges to avoid damage to the electronic components handled by the cleanroom workers ... Thus, the Acme garment fabric has to have an electrical resistivity in what is known as the "static dissipative" range so that any static charges on the fabric will travel to

one of the conductive ribbons sewn into the garment and be conducted safely to ground. In the Acme garment, all of the panels of material (sleeves, torso, and legs) and both cuffs are sewn together without any attempt to insulate them from one another, and the two ribbon systems extend to every panel of material and the cuffs to ensure that static charges to not have a chance to build up anywhere on the garment. In other words, the garment itself is grounded. *At the same time, there is enough difference in resistivity between the conductive ribbons and the garment fabric that the Acme garment still has dual paths to ground for purposes of monitoring whether both cuffs of the garment are in proper contact with the wrists of the wearer and the ribbon systems are properly functioning to conduct electricity.* Declaration of Gary W. Knoth in Opposition to Plaintiffs' Motion for Preliminary Injunction and Accelerated Pretrial Discovery ("Knoth Dec."), ¶ 8 (emphasis added). It appears that because the material Acme uses is more static resistive than the human body, "the electric current generated by the monitor will continue on through the wearer from cuff to cuff as intended." *Id.*, ¶ 17; *see also* Declaration of Brad Jubin in Support of Plaintiffs Tech Wear, Inc.'s and Anti–Static Cleanroom Technologies, Inc. d/b/a TW Clean's Reply to Defendant's Opposition to Motion for Preliminary Injunction and Accelerated Pretrial Discovery ("Jubin Dec."), ¶ 12 ("The high resistivity between the two grounding paths in the [Acme garment] appears to be due, at least in part, to the high resistance of the fabric of the garment."); Adams Dec., ¶ 34 ("I believe that the two grounding paths and the two grounding snaps in the [Acme garment] have a resistivity level which is sufficiently high to create an electrical barrier, such that electricity from one path is not likely to cross into the other.").

Adams' technology similarly keeps electricity between the two paths independent of each other, although the material her version uses actually conducts static electricity and then one of the paths to ground is insulated so that it remains independent of the other path. As Knoth explained Adams' system:

> [T]he material that is used to make the sleeves and the body section is a fabric knit of 89% polyester and 11% carbon-suffused monofilament nylon knitted into a conductive grid pattern having squares of approximately ⅛ to ¼ inch. The other path to ground in the garment of the '444 patent is formed by an electrically conductive ribbon ... from an inner cuff ..., which is insulated from the other sleeve ..., along that sleeve and the body section ... to a grounding terminal.... The ribbon is electrically insulated from the other sleeve ... and the body section ... by wrapping the ribbon in an insulating sheath ... formed by a section of cloth binding material made of insulative cotton or the like.

Knoth Dec., ¶ 15. As Adams explained in her second declaration, though, carbon is the key conducting element in each garment: "[t]he conductive ribbons in the [Acme garment] are made of polyester which incorporates carbon fibers. My '444 patent discloses using a polyester and carbon-suffused nylon fabric for the body section of the garment. In both cases, the carbon incorporated into the fabric is the element which provides the electrical connection between the grounding cuff and the grounding snap." Declaration of Kay Adams in Support of Plaintiffs Tech Wear, Inc.'s and Anti–Static Cleanroom Technologies, Inc. d/b/a TW Clean's Reply to Defendant's Opposition to Motion for Preliminary Injunction and Accelerated Pretrial Discovery ("Adams Reply Dec."), ¶ 15.

In short, at this early stage, it may well be that under the doctrine of equivalents, Acme's structure of effectively insulating the conducting ribbons using static dissipative fabric will constitute an insubstantial difference in the way plaintiffs' version operates. It is not yet possible, however,

at least on the record before the Court, to determine that the scope of the patent *clearly* includes an accused device that *effectively* "electrically insulated" one of the grounding means and "mutually isolated" the two paths to ground. In these circumstances, that is, without clear evidence of patent infringement or evidence of patent infringement plus irreparable injury, a preliminary injunction is not justified.

### 3. *The Remaining Claims*

Plaintiffs contend that a preliminary injunction should issue based on defendant's false advertising under both the Lanham Act and the California Business and Professions Code. The evidence for plaintiffs' claims, however, consists of Adams' statements of her belief that Acme is representing that its garment provides dual paths to ground. *See* Adams Dec., ¶ 17. As Acme president Jan Rome stated, however, Acme does not advertise the H1263 for sale in any media, but rather developed the garment together with two of its end-users, IBM and Western Digital. Declaration of Jan Rome in Opposition to Plaintiffs' Motion for Preliminary Injunction and Accelerated Pretrial Discovery ("Rome Dec."), ¶¶ 6, 9, 17. There is no evidence that these end-users feel deceived. Indeed, Mr. Knoth described his involvement in developing the Acme garment and expressed satisfaction with its design and performance. *See* Knoth Dec., ¶¶ 2, 6, 11, 13, 19. Plaintiffs have thus failed to carry their burden on this motion of demonstrating the likelihood that they will succeed on the merits and the irreparable injury they will suffer if Acme is not enjoined. Accordingly, the motion for preliminary injunction is denied.

### 4. *Accelerated Discovery*

Given defendant's counsel previous offer to stipulate to expedited discovery and an expedited trial, "the Court's calendar permitting," no meaningful dispute exists concerning this request. The Court therefore grants plaintiffs' request.

IT IS SO ORDERED.