**SONY ELECTRONICS, INC., et al.**

v.

**SOUNDVIEW TECHNOLOGIES, INC.**

No. 3:00CV754(JBA).

United States District Court,
D. Connecticut.

Sept. 25, 2002.

Gale R. Peterson, San Antonio, TX, pro se.

Jacqueline D. Bucar, S. Peter Sachner, Timothy P. Jensen, Tyler, Cooper & Alcorn, New Haven, CT, Richard L. DeLucia, Richard S. Gresalfi, Elizabeth A. Gardner, Thomas R. Makin, Kenyon & Kenyon, New York, NY, Gary M. Hoffman, Dick-

stein, Shapiro, Morin & Oshinsky, Washington, DC, Stephen P. Sachner, Hitt, Sachner & Miele, Cheshire, Richard M. Steuer, Mayer, Brown, Rowe & Maw, New York, NY, Jaime A. Siegel, Park Ridge, NJ, for Sony Electronics Inc.

### *Ruling on Motion for Summary Judgment of Non–Infringement [Doc. # 328]*

ARTERTON, District Judge.

Pursuant to § 551 of the Telecommunications Act of 1996,[1] the Federal Communications Commission has adopted regulations mandating that all 13–inch or larger television sets sold after January 1, 2000 be capable of blocking the display of violent or sexually explicit programming that may be objectionable to viewers. *See generally* 47 C.F.R. § 15.120 ("Program blocking technology requirements for television receivers"). Soundview Technologies, Inc. ("Soundview"), holds a patent (the '584 patent)[2] on a "video and audio blanking system" that allows television viewers to block programs carrying a certain rating. Plaintiffs are group of manufacturers and trade groups whose televisions contain a v-chip which complies with the FCC's standard. They have brought this action against Soundview for, *inter alia,* a declaration that their televisions' v-chips which contain program blocking technology do not infringe the '584 patent.

In the present motion for summary judgment, the moving parties, termed the Non–Soundview Parties,[3] consist of five television manufacturers and two industry associations accused of inducing infringement. They assert that under a proper construction of Soundview's '584 patent, there is no material dispute of fact and the Non–Soundview Parties are entitled to judgment of non-infringement as a matter of law. Specifically, the Non–Soundview Parties contend that the '584 patent is only infringed by devices containing "separate rating signal lines," which their televisions do not have. In opposition, Soundview advances a different construction of the term "separate rating signal lines" under which it claims infringement by the televisions, both literally and under the doctrine of equivalents, requiring trial disposition.[4]

For the reasons set out below, the Court concludes that under the proper construction of the '584 patent, no genuine issue of material fact remains in order to determine whether the v-chip televisions infringe the '584 patent, and that summary judgment of non-infringement is appropriate.

### I. The '584 Patent and the V–Chip Televisions

#### A. The '584 Patent

The '584 patent is comprised of 31 claims, the first of which is independent, while the remainder are dependant.[5] It is

---

1. P.L. 104–104, codified at 47 U.S.C. §§ 303 & 330.

2. U.S.Patent No. 4,554,584.

3. Sony Corporation of America, Sony Electronics, Inc., Mitsubishi Digital Electronics America, Sharp Electronics Corp., Toshiba America Consumer Products, Inc., the Consumer Electronics Association, and the Electronic Industries Alliance.

4. Soundview has not cross-moved for summary judgment on the infringement issue.

5. The "claims" comprise the patent: they are "the portion of the patent document that defines the scope of the patentee's rights," i.e., the right to exclude others from making the invention. *Markman v. Westview Instruments,* 517 U.S. 370, 372, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996); *accord* Herbert F. Schwartz, *Patent Law & Practice* (Fed. Judicial Center, 3d ed.2001) at 14–15 ("The claims set the metes and bounds of the patent owner's exclusive rights."). "An independent claim is completely self-contained. A dependent claim refers back to one earlier claim

the construction of the first claim which is at issue in this motion:

We claim:

1. A television editing system activated by transmitting digital codes for blanking at least part of the output of a receiver, in which the receiver includes at least a portion of a captioning circuit means for detecting digital data if present in the transmitted signal and supplying the data to a data bus;

wherein said editing system comprises an auxiliary circuit which includes a character detector, rating select switch means, and blanking logic means;

the character detector having inputs coupled to said data bus, means for decoding predetermined digital codes of a special set of characters, and output to rating signal lines, there being a separate rating signal line for each character of said special set;

the rating select switch means having settings for different ratings; and

the blanking logic means having logic circuits coupled to the rating signal lines and to the rating select switch means to compare the switch setting to signals on the rating signal lines, and in response to the comparison to generate a logic output signal condition for selectively either blanking or not blanking at least part of the receiver output.

'584 patent, Claim 1.

This claim describes an auxiliary circuit with three elements: (1) a "character detector," (2) a "rating select switch means,"

and (3) a "blanking logic means." The "rating selector switch means" is the device that parents, for example, would use to select what kind of programming they will allow their children to watch. The "character detector" picks up the broadcaster's pre-embedded "digital codes of a special set of characters," which are the codes that describe the content of the program and are transmitted in the closed captioning signals transmitted with television programming. Finally, the "blanking logic means" compares the rating embedded in the broadcaster's signal to the user's expressed preference to determine whether the particular program should be displayed or blocked. In the system pictured in the drawings and described in the Detailed Description of the Drawings, there were three possible program content ratings (G, PG, and R), and each rating could be correlated with either the video or audio portions of a television program, yielding six rating codes: Gv, PGv, Rv, Ga, PGa, and Ra.

For the purposes of this motion, the central element of importance is the description of the character detector in Claim 1, and in particular its requirement that the character detector have separate rating signal lines. Included in the patent is a drawing of the character detector, Figure 2A (which is then described in the "Detailed Description of the Drawing"):

Claim 1 of the patent describes the character detector as "having inputs coupled to said data bus" [the data bus is Object 54 in Figure 2A, *see* Col. 3 lines 44–46], means for decoding

and is considered to include all of its own limitations as well as those of the referenced claim." *Id.* at 15.

Patents are also required to contain, in addition to the claims, "a written description of the invention, and of the manner and process

of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art ... to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out [the] invention." 35 U.S.C. § 112(1).

ASCII CHARACTER DETECTOR

*Fig. 2A*

predetermined digital codes of a special set of characters, and output to rating signal lines, *there being a separate rating signal line for each character of said special set.*" Col. 9, lines 37–40 (emphasis added). In Figure 2A, these "separate rating signal lines" are the six lines that intersect with cable 56 on the far right of the diagram, as they are clearly labeled "Gv," "PGv," "Rv," "Ga," "PGa," and "Ra," and in the "Detailed Description of the Drawing," the following explanation is given:

Gv is the video "G" rating signal line.

PGv is the video "PG" rating signal line.

Rv is the video "R" rating signal line.

Ga is the audio "G" rating signal line.

PGa is the audio "PG" rating signal line.

Ra is the audio "R" rating signal line.

Col. 6, lines 3–8. These same lines appear in Figures 2B (the lamp interface circuit), 2C (the audio and video blanking logic), and 2D (an alternate configuration of the audio and video blanking logic), each time represented by a discrete line that is labeled with one of three ratings (G, PG or R) and a designation of either audio ("a") or video ("v").

In Figure 2B, the lines are labeled vertically on the far left of the figure and travel across the entire figure. In Figure 2C, they are labeled in the upper left corner of the figure, as they are in Figure 2D, the alternate configuration of the audio and video blanking logic.

LAMP INTERFACE
CIRCUIT

*Fig.* 2B

AUDIO AND VIDEO
BLANKING LOGIC

*Fig.* 2C

AUDIO AND VIDEO
BLANKING LOGIC

*Fig. 2D*

B. The V–Chip Televisions and the Industry–Wide Ratings

Under the applicable FCC regulation (47 C.F.R. § 15.120), the televisions must comply with industry standard EIA–744–A, "Transport of Content Advisory Information Using Extended Data Service (XDS)," and EIA–608, "Recommended Practice for Line 21 Data Service," both published by the Electronics Industries Association. 47 C.F.R. § 15.120(d)(1).[6] EIA–744–A requires television receivers to be capable of recognizing and blocking 54 separate ratings: both the MPAA rating system (N/A, G, PG, PG–13, R, NC–17, X and NOT RATED), the TV Parental Guidance System age-only ratings (NONE, TV–Y, TV–Y7, TV–G, TV–PG, TV14 and TV–MA), as well as the TV Parental Guidance System content-based ratings (which uses the age ratings plus most combinations of the indicators FV, V, S, L and D).[7] EIA–744–A also requires that any given program be assigned only one of the 54 possible ratings. *See* EIA–744–A at 6 ("[t]he data within this packet shall not change during the course of a program").

The televisions alleged to infringe the '584 patent each have a parental control feature that complies with EIA–744–A. *See* Shintani Decl. ¶ 7 (Sony televisions); Mishima Decl. ¶ 7 (Mitsubishi

---

**6.** While the regulation refers to "EIA–744" (no "A" at the end) the parties agree that EIA–744–A controls. *See* Soundview's Local R. 9(c)(2) Statement at 12 (response to ¶ 23) ("[t]he EIA–744[–]A specification with which the Sony parties' television sets must comply . . . .").

**7.** Soundview's counting of the possible ratings yields only 53, which results from omitting the second "NONE" rating provided for in EIA–744–A Table 4. The inclusion or omission of this second "NONE" rating has no bearing on the discussion here, but for clarity and consistency, it will be assumed that there are 54 (not 53) total possible ratings under the EIA–744–A standards.

televisions); Hoshino Decl. ¶ 4 (Sharp televisions); Johnson Decl. ¶ 4 (Toshiba televisions). The televisions "extract ratings from a received television signal and compare these ratings to the user-selected ratings[, blocking programs when] the received rating corresponds to a rating intended to be blocked (as selected by the user)." Shintani Decl. ¶ 9; *accord* Mishima Decl. ¶ 7; Johnson Decl. ¶ 8; *see also* Hoshino Decl. ¶ 3 (stating that Sharp's televisions "include a parental control functionality in accordance with FCC requirements").

Both sides agree that the Non–Soundview parties' televisions perform the blocking function by using processors with either 8– or 16–bit multifunctional internal data buses. Soundview's Local R. 9(c) Statement ¶¶ 30–31 (agreeing to this description); *see also* Shintani Decl. ¶ 14; Mishima Decl. ¶ 11; Hoshino Decl. ¶ 8; Johnson Decl. ¶ 11. The processors are multifunctional in the sense that they "are also used to transfer closed captioning data, on-screen display, and picture-related data (e.g., contrast, brightness, color) within the microcomputer." Shintani Decl. ¶ 14. "Thus, it is not possible to determine solely from the high ("1") or low ("0") bit pattern of a data bus whether the data relates to one of the 54 ratings or to something else, such as brightness data." *Id.* These processors, the Non–Soundview Parties contend, do not meet the requirement of the patent that there be a "separate rating signal line" for each possible rating that can be received. Specifically, under the industry-created standards adopted in the FCC's regulations, there are 54 possible content ratings, and the Non–Soundview Parties maintain that the microprocessors in their televisions have "no set of 54 lines or conductors ... wherein each line of the set corresponds to one of the 54 ratings." Shintani Decl.

¶ 13; *accord* Mishima Decl. ¶ 11; Hoshino Decl. ¶ 9; Johnson Decl. ¶ 12.

Soundview responds in three principal ways. First, it contends that the v-chip televisions do in fact have 54 "separate rating signal lines" because they are capable of responding to 54 separate ratings. In making this first argument, Soundview disputes the Non–Soundview Parties' contention that "lines" means conductors, and assigns a different meaning to the term "separate rating signal lines." It posits that a rating signal line is a "separate pattern" or binary code on cable 56 of Figure 2A. *See* Gafford Decl. ¶¶ 15 & 18 (defining a separate rating signal line as "a separate state on the conductors"). Thus, Soundview argues, the televisions have at least 54 separate rating signal lines "since they carry 54 distinct and separate digital patterns, each with a separate and unique arrangement of energized and non-energized conductors." *Id.* Second, Soundview argues that there are not, effectively, 54 ratings, because there are three mutually exclusive rating systems, and thus, at any given time, a television only is required to detect eight, seven or thirty-eight ratings (depending upon the rating system in use), not all 54. When the televisions are receiving ratings that are associated with a system of fewer than eight possible ratings, the second argument continues, the televisions are infringing because there is one rating signal line for each of the eight or fewer ratings. Finally, Soundview asserts that even if the Court rejects these first two positions, summary judgment is nonetheless improper because a jury could find infringement under the doctrine of equivalents.

## II. Standard

### A. The Summary Judgment Standard

Under Fed.R.Civ.P. 56(c), summary judgment is proper "if the pleadings, depo-

sitions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden of establishing that there is no genuine issue of material fact in dispute will be satisfied if he or she can point to an absence of evidence to support an essential element of the non-moving party's claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *accord Parker v. Sony Pictures Entm't, Inc.,* 260 F.3d 100, 111 (2d Cir.2001) ("A defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial. It need only point to an absence of proof on plaintiff's part, and, at that point, plaintiff must 'designate specific facts showing that there is a genuine issue for trial.' ") (*quoting Celotex,* 477 U.S. at 324, 106 S.Ct. 2548); *Novartis Corp. v. Ben Venue Labs., Inc.,* 271 F.3d 1043, 1046 (Fed.Cir.2001) ("Since the ultimate burden of proving infringement rests with the patentee, an accused infringer seeking summary judgment of noninfringement may meet its initial responsibility either by providing evidence that would preclude a finding of infringement, or by showing that the evidence on file fails to establish a material issue of fact essential to the patentee's case." (*citing Vivid Tech., Inc. v. American Sci. & Eng'g, Inc.,* 200 F.3d 795, 807 (Fed.Cir. 1999)). The non-moving party, in order to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury verdict in his or her favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("there is no issue for trial unless there is sufficient evidence fa-

voring the nonmoving party for a jury to return a verdict for that party").

When deciding a motion for summary judgment, " 'the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion.' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (*quoting United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)). However, a party opposing summary judgment "may not rest upon the mere allegations or denials of the adverse party's pleading." Fed. R.Civ.P. 56(e). Thus, "[s]ummary judgment of noninfringement may only be granted if, after viewing the alleged facts in the light most favorable to the nonmovant and drawing all justifiable inferences in the nonmovant's favor, there is no genuine issue whether the accused device is encompassed by the patent claims." *Novartis,* 271 F.3d at 1046 (*citing Pitney Bowes, Inc. v. Hewlett–Packard Co.,* 182 F.3d 1298, 1304 (Fed.Cir.1999)).

## B. Processes for Analyzing Patent Infringement Claims

"Determining patent infringement requires determining whether someone (1) without authority (2) makes, uses, offers to sell, sells, or imports (3) the patented invention (4) within the United States, its territories, or its possessions (5) during the term of the patent." Herbert F. Schwartz, *Patent Law & Practice* (Fed. Judicial Center, 3d ed.2001) at 131 (footnote omitted) (*citing* 35 U.S.C. § 271(a)). The element at issue in this motion is the third, that is, whether the televisions are "the patented invention."

When addressing this third element, a two-step process is used: first, the court determines the meaning, as a matter

of law, of the particular claim or claims at issue, and second, it must be determined whether the accused product infringes the properly construed claim, which is generally a question of fact. *Markman v. Westview Instruments,* 517 U.S. 370, 384, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996); *Allen Eng'g Corp. v. Bartell Indus., Inc.,* 299 F.3d 1336, 1344 (Fed.Cir.2002). However, summary judgment is appropriate if the record reveals no genuine issue of disputed fact. *Cf. Warner–Jenkinson Co. v. Hilton Davis Chem. Co.,* 520 U.S. 17, 39 n. 8, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997) (*citing* Fed.R.Civ.P. 56 and *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

■■■ "[A] claim is infringed only if each limitation in the claim is found in the accused device, either literally or by a substantial equivalent." *Vehicular Techs. Corp. v. Titan Wheel Int'l, Inc.,* 141 F.3d 1084, 1089 (Fed.Cir.1998). There are thus two varieties of infringement: literal infringement and infringement under the doctrine of equivalents. "[A]n accused product literally infringes if every limitation recited in the claim appears in the accused product, i.e., the properly construed claim reads on the accused product exactly." *Jeneric/Pentron, Inc. v. Dillon Co.,* 205 F.3d 1377, 1382 (Fed.Cir.2000) (*citing Amhil Enters. Ltd. v. Wawa, Inc.,* 81 F.3d 1554, 1562 (Fed.Cir.1996)). "Infringement may be found under the doctrine of equivalents when ... [1] every limitation of the asserted claim, or its equivalent, is found in the accused subject matter, [2] the latter differs from what is literally claimed only insubstantially, and [3] it performs substantially the same function in substantially the same way to achieve substantially the same result." *Wright Medical Tech. v. Osteonics Corp.,* 122 F.3d 1440, 1444 (Fed.Cir.1997) (*citing, inter alia, Warner–Jenkinson,* 520 U.S. at 40, 117 S.Ct. 1040).

## III. Analysis

The Court's first task is to determine the precise scope of the particular claims in dispute. *Markman v. Westview Instruments,* 517 U.S. 370, 384, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). By order pursuant to Fed.R.Civ.P. 53, the Court appointed a special master, Gale R. Peterson, to prepare a report and recommendation on claim construction. After a hearing and the issuance of a draft report with a time period for objections, the Special Master issued a 94–page "Report and Recommendation on Claim Construction" [Doc. # 284]. Portions of the Special Master's report are uncontested by all parties, objections have been made to other portions, and the Court must undertake a *de novo* construction of the disputed portions of the patent that are relevant to disposition of this motion.

■■■ The principal question presented is the meaning of Claim 1's express requirement that the character detector have "a separate rating signal line for each character of said special set." As the Special Master noted, the meaning of this requirement is linked to the proper definition of the "predetermined digital codes of a special set of characters," Report at 45, which, in a persuasively reasoned portion of the Report to which Soundview did not object, the Special Master recommended be defined as follows:

> In claim 1, "predetermined digital codes of a special set of characters" means digital codes that represent some criteria relating to program content....

Report at 72. The Special Master explained:

> The specification teaches that one set of criteria or standards may be the familiar movie ratings G, PG and R. Another set of criteria or standards identified in the specification is "Educational," "Political," or "Entertainment." It is apparent

from the specification, though, that while a set of criteria or standards is necessary, the actual designations that are chosen are immaterial, i.e., G, PG, and R are exemplary only. The point is, as the specification explains, there must be "some criteria relating to the program in progress."

Report at 48 (quoting Col. 2, lines 14–15).

Thus, for each separate "criteria relating to program content," the character detector of an accused device must have one discrete rating signal line in order to infringe the express terms of the patent. In addition to being mandated by the plain language of Claim 1, this construction finds substantial support in the remainder of the specification. The device pictured in the figures and described in the Detailed Description of the Drawing used six possible ratings: Ga, Gv, PGa, PGv, Ra, and Rv. Figure 2A (reproduced above) depicts the character detector and clearly portrays six separate lines, each labeled either "Gv," "PGv," "Rv," "Ga," "PGa," or "Ra." The Detailed Description of the Drawing then explains:

> In the embodiment which was tested, six characters are decoded and the output line 56 has six conductors. All six conductors go to both the blanking logic 2C and the lamp circuit 2B, as shown in FIGS. 2C and 2B, as follows:
>
> > Gv is the video "G" rating signal line.
> > PGv is the video "PG" rating signal line.
> > Rv is the video "R" rating signal line.
> > Ga is the audio "G" rating signal line.
> > PGa is the audio "PG" rating signal line.
> > Ra is the audio "R" rating signal line.

Col. 5, line 65 through Col. 6, line 8.

■ While the two portions of the patent quoted above are not part of the formal, numbered claims of the patent, the term "separate rating signal lines" *is* an express part of Claim 1. It is a canon of claim construction that while "one may not read a limitation into a claim from the written description[ ], one may look to the written description to define a term already in a claim limitation." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed.Cir.1998). This is because the language contained in a claim "must be read in view of the specification of which it is a part." *Id.; see also Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed.Cir.1996) ("The specification contains a written description of the invention which must be clear and complete enough to enable those of ordinary skill in the art to make and use it. Thus, the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.").

A. Presence of 54 Rating Signal Lines in the Non–Soundview Parties' Televisions

Soundview's first contention is that a rating signal line is a "separate pattern" or binary code, and thus in the device pictured in the figures and described in the Detailed Description of the Drawings, the rating signal line is the "pattern" on cable 56 of Figure 2A. *See* Gafford Decl. ¶¶ 15 & 18 (defining a separate rating signal line as "a separate state on the conductors"). Using this definition of "rating signal line," Soundview then argues that the Non–Soundview Parties' televisions have at least 54 separate rating signal lines "since they carry 54 distinct and separate digital patterns, each with a separate and unique arrangement of energized and non-energized conductors." *Id.*

Under this reading, the rating "Gv" would be transmitted by lighting up the "Gv" line and keeping the rest of the lines cold, thus yielding the pattern 100000 (where the "one" indicates a hot line Gv

and "zeros" indicate that the remaining lines are cold). Similarly, the rating "PGa" would be signaled by lighting up the "PGa" line and keeping the rest of the lines cold: 000010. *See* Soundview's Br. [Doc. # 338] at 10 ("It should be noted, of course, that Fig. 1 of the patent shows an ASCII character detector 2A which has a single output line 56 and that the single output line 56 is then shown in Fig. 2A as a series of separate conductors which carry the binary code—0's and 1's—for each rating."); Tr. [Doc. # 70] at 40–41 (explaining this contention in greater detail).

Soundview's proposed construction of "rating signal lines" lacks any support in the text of the claims, and is clearly belied by the remainder of the specification. Nowhere are cable 56 or the "patterns" that are claimed to appear on cable 56 described as the indicator(s) of the program rating. To the contrary, all descriptions of the "rating signal lines" point to the lines that cross cable 56 (i.e., the lines specifically labeled "Gv," "PGv," etc., in Figures 2A, 2B, 2C and 2D). Given that the actual words of the claim are the controlling focus of the Court's inquiry, *Digital Biometrics v. Identix, Inc.*, 149 F.3d 1335, 1344 (Fed.Cir.1998), Soundview's interpretation of "rating signal lines" is impaired by the absence of any indication in the claims or the specification that a rating signal line means a "pattern" on cable 56, in light of the explicit language to the contrary in the Detailed Description of the Drawing ("Gv is the video 'G' rating signal line. . . .").

It is true that in the character detector pictured in Figure 2A and described in the Detailed Description of the Drawing, a lighted "Gv" line can only mean something to the blanking logic means if the remaining lines are cold. In the device described in the specification, even if a program had a "G" rating for the video portion and an "R" rating for the audio portion,[8] the blanking logic means could not properly interpret a signal where both the "Gv" and "Ra" lines were lighted at the same time. *See* Col. 4, lines 3–5 ("To properly rate a program picture and sound . . . requires the audio and video rating codes to be alternately sent."). Thus, in that sense at least, the signal "Gv" could theoretically be described as the code "100000" (that is, the "pattern" that would exist on cable 56 if only the first of six lines crossing cable 56 was 'hot' ["1"], with the remaining five lines 'cold' ["0"] would be written as "100000"), just as the signal "Ra" might be described as "000001."

Despite this clever attempt to describe a "hot" conductor as just one part of a larger "pattern" of ones and zeros, the specification could not be clearer in its contrary definition of a rating signal line. The specification at one point identifies cable 56 as "the output line 56," Col. 5, line 67, but in the very next sentence each discrete line crossing cable 56 is specifically labeled as a "rating signal line" ("Gv is the video 'G' rating signal line" etc.); thus, "the output line 56" is not equated with the separately-used term "rating signal line," as it is under Soundview's construction. Addi-

8. In the device pictured in the figures and described in the Detailed Description of the Drawing, separate audio and video ratings are considered possible. *See, e.g.,* Col. 6, lines 46–49 ("A single common rating select switch controls both the audio and video circuits; two separate rating select switches could have been used to separately select audio and video ratings."). However, the ratings must not be sent at the same time. *See*

Col. 4, lines 3–5 ("To properly rate a program picture and sound . . . requires the audio and video rating codes to be *alternately* sent.") (emphasis added). This is not possible under the EIA–744–A standard, which requires that any given program (both audio and video) be assigned only one of the 54 possible ratings. *See* EIA–744–A at 6 ("[t]he data within this packet shall not change during the course of a program").

tionally, the figures specifically label the lines crossing cable 56 with their own ratings.

Thus, it cannot be, as Soundview contends, that the "pattern" on cable 56 is the rating signal line. The only way to read the claim language in light of the specification of which it is a part (and thus construe the patent as a fully integrated written document) is to adopt the Non–Soundview Parties' reading of the term "rating signal lines." Soundview's argument is without textual support in Claim 1 itself and is contrary to the description of the invention, in which the term "rating signal line" was assigned a specific meaning.

■ Under the above construction of this key portion of Claim 1 of the '584 patent, there is no genuine issue of material fact concerning whether the televisions manufactured by the Non–Soundview Parties have or lack 54 separate rating signal lines. The Shintani, Mishima, Hoshino and Johnson declarations assert that the accused televisions have "no set of 54 lines or conductors . . . wherein each line of the set corresponds to one of the 54 ratings." Shintani Decl. ¶ 13; *accord* Mishima Decl. ¶ 11; Hoshino Decl. ¶ 9; Johnson Decl. ¶ 12. Instead, the televisions have processors with either 8– or 16–bit internal data buses. Shintani Decl. ¶ 14; Mishima Decl. ¶ 11; Hoshino Decl. ¶ 8; Johnson Decl. ¶ 11.

While these declarations could have more precisely described the structure and operation of the processors used in the accused televisions, they are sufficiently precise to meet the Non–Soundview Parties' burden of pointing to an absence of evidence to support an essential element of a claim on which Soundview will bear the burden of proof at trial, *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), and thus Soundview is required to come forward with evidence that would be sufficient to

support a jury verdict in its favor, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party").

Soundview's attempt carry this burden fails, because its assertion that the Non–Soundview Parties' televisions have 54 rating signal lines is based on its flawed definition of "rating signal line." In the Declaration of Thomas Gafford, submitted by Soundview, Gafford describes the basis for his assertion that the televisions do, in fact, have 54 rating signal lines:

My review of the software and circuit/logic diagrams for the microprocessors used in the Sony parties' products reveals that they use a separate rating signal line, *i.e., a separate state on the conductors from decoder to blanking logic,* for each rating character from whatever character set they are interpreting. Each of those rating signals is, by definition, unique: that is how the accused television sets are able to control the blanking logic means to reflect each individual and distinct rating. Each rating signal line must carry a unique digital pattern on its conductors, and the unique digital pattern it carries is the result of the decoding of the "predetermined digital codes" by the decoder. Thus, the Sony parties' own software and logic diagrams (which their declarants ignore completely) demonstrates that their television sets to have 54 "separate rating signal lines" if used with a special set having 54 characters.

Gafford Decl. ¶ 18 (emphasis added). The Declaration of John Snell reasons to the same conclusion via the same route: "Non–Soundview parties say their television sets can respond to 54 ratings. Thus, contrary to the assertions of the Non–Soundview parties' declarants, their V-chip

television sets do include 54 separate rating signal lines operating on the full set of 54 ratings." Snell Decl. ¶ 20. "Stored at separate times, 54 different numbers in a given register cause at the register output 54 separate rating signal lines *** Therefore, the Non–Soundview Parties' V-chip television sets have 54 separate rating signal lines." *Id.* ¶ 19.

Because they are based on a flawed definitional premise, the Gafford and Snell declarations are insufficient to rebut the factual content of the Shintani, Mishima, Hoshino and Johnson declarations and do not create a genuine issue of material fact for trial. *Arthur A. Collins, Inc. v. Northern Telecom Ltd.,* 216 F.3d 1042, 1047 (Fed.Cir.2000) ("When, as here, the construction of a critical claim limitation is in dispute, a party may not avoid summary judgment simply by offering an opinion of an expert that states, in effect, that the critical claim limitation is found in the accused device."); *Display Techs., Inc. v. Paul Flum Ideas, Inc.,* 282 F.3d 1340, 1348 (Fed.Cir.2002); *Transmatic, Inc. v. Gulton Indus.,* 53 F.3d 1270, 1278 (Fed. Cir.1995).

### B. "Part Time" Infringement

Soundview's second contention is that the issue of infringement must be examined in terms of each rating system and that the accused televisions infringe when operating on the MPAA rating system and the TV Parental Guidance (Age) rating system where, for example, there are eight or fewer ratings.

Soundview's argument is once again premised on the interpretation of "rating signal lines" as merely a pattern, configuration or state of being, which the Court has rejected. Soundview contends that in

a world with only eight ratings (e.g., the MPAA system only), the accused televisions infringe because their 8–bit data buses happen to numerically match the number of possible ratings. However, as the Non–Soundview Parties persuasively show in their reply brief, this fails to take into account that under the proper construction of "rating signal line," the accused television still have no separate rating signal line for each rating, as the EIA–744–A standard provides that "[t]he three bits r0–r2 shall be used to encode the MPAA picture rating," EIA–744–A at 1, and sets out this chart:

| r2 | R1 | r0 | Rating |
|----|----|----|--------|
| 0 | 0 | 0 | N/A |
| 0 | 0 | 1 | G |
| 0 | 1 | 0 | PG |
| 0 | 1 | 1 | PG–13 |
| 1 | 0 | 0 | R |
| 1 | 0 | 1 | NC–17 |
| 1 | 1 | 0 | X |
| 1 | 1 | 1 | Not Rated |

Table 3, EIA–744–A at 2. As the Non–Soundview Parties point out tellingly, in a system where each "hot" or "cold" message was carried by a separate conductor (such as in Soundview's proffer of Figure 2A's structure and function), half of the ratings (PG–13, NC–17, X and Not Rated) under the EIA–744–A standard could only be sent with more than one of the "lines" activated at any one time, a situation excluded by the express language of Claim 1. The EIA–744–A standard, therefore, uses the same binary coding that is simply not covered by Claim 1's express "separate rating signal lines" limitation.[9]

Additionally, while it is true that under EIA–744–A a program may not be rated under both "systems" at the same time (e.g., a program cannot be rated both "G" and "TV–Y"), this reflects only the fact

---

9. *See also* Shintani Decl. ¶ 14 (describing the multi-functional nature of data buses and concluding that "it is not possible to determine solely from the high ("1") or low ("0") bit pattern of a data bus whether the data relates to one of the 54 ratings or to something else, such as brightness data.

that a televised program may only have one rating of any kind at any given time; a televised program could similarly not be rated both G and PG, or both TV–Y7–FV and TV–PG, at the same time. Any given television program can be assigned any one of the 54 ratings, and to be in compliance with EIA–744–A, a television must be able to recognize and block any of these 54 ratings. Whether certain of the ratings can be logically grouped into "subsets" of this broader 54 rating standard is of no import in the infringement inquiry.

### C. Doctrine of Equivalents

Soundview next asserts that even under the claim construction which the Court has now adopted, there is still a factual question regarding infringement under the doctrine of equivalents, because a jury could conclude that the accused televisions have some combination of elements, taken together, that are equivalent to 54 separate rating signal lines. The Non–Soundview Parties respond that the doctrine of equivalents is inapplicable here, because to read equivalency would eviscerate an express limitation in the patent: namely, separate (not shared) rating signal lines.

■■■ The doctrine of equivalents requires that the accused product contain each element of each claim or the equivalent of each element of each claim. *War-ner–Jenkinson Co. v. Hilton Davis Chem. Co.,* 520 U.S. 17, 40, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997) (describing the "essential inquiry" as "Does the accused product or process contain elements identical or equivalent to each claimed element of the patented invention?"); *Wright Medical Tech. v. Osteonics Corp.,* 122 F.3d 1440, 1444 (Fed.Cir.1997) (equivalency requires that "every limitation of the asserted claim, or its equivalent, is found in the

accused subject matter, the latter differs from what is literally claimed only insubstantially, and it performs substantially the same function in substantially the same way to achieve substantially the same result."). An element in the accused product is equivalent to a claim element if the differences between the two are insubstantial to one of ordinary skill in the art. *Warner–Jenkinson,* 520 U.S. at 39–40, 117 S.Ct. 1040. The Supreme Court has counseled that in order to guard against allowing the concept of equivalence to "eliminate completely" any elements of a claim, courts must "focus on individual elements" and "anal[yze] the role played by each element in the context of the specific patent claim." *Id.* at 40, 117 S.Ct. 1040. Such an analysis "will thus inform the inquiry as to whether a substitute element matches the function, way, and result of the claimed element, or whether the substitute element plays a role substantially different from the claimed element." *Id.*

■■■ Here, the purview of the '584 patent, which requires that pulses be sent along separate physical conductors, cannot be equivalent to the accused televisions, which use processors operating exclusively with binary code to perform not only the blocking feature but also closed captioning, on-screen display, and feature adjustment (e.g., brightness) features of the televisions, even though the separate means of functioning share the same blocking objective. A finding of equivalency would eviscerate the patent's express requirement that there be "separate rating signal lines" for each possible rating.

The centrality of this requirement and the remaining limitations set out in Col. 6, lines 37–41 [10] to the invention covered by the '584 patent is evidenced by the patent examiner's statement of reasons for pat-

---

**10.** "... the character detector having inputs coupled to said data bus, means for decoding predetermined digital codes of a special set of characters, and output to rating signal lines, there being a separate rating signal line for each character of said special set."

entability (issued during a reexamination of the patent), in which the patent examiner distinguished the prior art from the scope of the '584 patent:

> Regarding [Claim 1 of the '584 patent], the prior art lacks, in a tv editing system activated by transmitted digital codes for blanking at least past of the output of a receiver, the claimed character detector having inputs coupled to a data bus for receiving digital data, having a means for decoding predetermined digital codes of a special set of characters and *having an output to rating signal lines wherein there is a separate rating signal line for each character of the special set.*

[Doc. # 329 Ex. C] at 209 (emphasis added). Thus, at least one of the three distinguishing features of Claim 1 would be vitiated by a determination that the accused televisions are "equivalent" to what is covered by the '584 patent.[11]

"[I]f a court determines that a finding of infringement under the doctrine of equivalents 'would entirely vitiate a particular claim element,' then the court should rule that there is no infringement under the doctrine of equivalents." *Bell Atl. Network Servs., Inc. v. Covad Communs. Group, Inc.,* 262 F.3d 1258, 1280 (Fed.Cir. 2001) (*quoting Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.,* 234 F.3d 558, 587 (Fed.Cir.2000), vacated and remanded on other grounds, — U.S. —, 122 S.Ct. 1831, 152 L.Ed.2d 944 (2002)); *accord Warner–Jenkinson,* 520 U.S. at 39 n. 8, 117 S.Ct. 1040 ("under the particular facts of a case, if ... a theory of equivalence would entirely vitiate a particular claim element, partial or complete judgment should be rendered by the court, as

there would be no further material issue for the jury to resolve").

▮ Soundview's claim that infringement under the doctrine of equivalents is possible "providing the difference between [the] devices and the claimed invention were insubstantial ...," Soundview Br. [Doc. # 338] at 26, is incorrect. The Supreme Court in *Warner–Jenkinson* expressly held that "the doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole." 520 U.S. at 29, 117 S.Ct. 1040. Even when making the element by element comparison, "[i]t is important to ensure that the application of the doctrine ... is not allowed such broad play as to effectively eliminate that element in its entirety." *Id.* As set out above, applying equivalency in this context would vitiate an element of the claimed invention—an element that was so central to the invention that upon reexamination, the patent examiner listed it as one of the three reasons why Claim 1 of the '584 patent was patentable.

## IV. Conclusion

For the reasons set out above, the Court concludes that under the correct construction of the '584 patent, no genuine issue of material fact exists regarding infringement, and the Non–Soundview Parties are entitled to summary judgment of non-infringement. The Non–Soundview Parties' Motion for Summary Judgment [Doc. # 328] is GRANTED.

IT IS SO ORDERED.

---

11. While Soundview cites *Dow Chem. Co. v. Sumitomo Chem. Co.,* 257 F.3d 1364, 1382 (Fed.Cir.2001) for the proposition that statements by an examiner will not necessarily limit a claim, the import of the examiner's statement is not given effect in this regard as any limitation on the claim; rather, the statement shows the centrality of a limitation *already present* in Claim 1.